P., Plaintiff,

v.

**DELTA AIR LINES, INC., and M., Defendants.**

No. 99 CV 4127.

United States District Court, E.D. New York.

June 29, 2000.

Timothy C. Davis, Lorelle J. Chin, Kristy L. Capogrossi, Clapp, Moroney, Bellagamba, Davis and Vucinich, Menlo Park, CA, Allegra L. Fishel, Beranbaum, Menken, Ben–Asher & Fishel, New York City, Richard O'Keeffe, O'Keeffe & Lindgren, White Plains, NY, for Plaintiff.

Janine Syll Simerly, Gilmore F. Deikmann, Jr., Simone A. Pam, Seyfarth, Shaw, Fairweather & Geraldson, San Francisco, CA, Benjamin A. Stone, Delta Air Lines, Inc., Law Department, Atlanta, GA, for Defendant Delta.

Robert J. Conway, Steven L. Sonkin, Marshall, Conway & Wright, P.C., New York City, for Defendant M.

*AMENDED PARTIAL JUDGMENT, MEMORANDUM and ORDER*

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I   INTRODUCTION ................................................... 135

II  FACTS .......................................................... 135

III STATUTORY SEXUAL HARASSMENT ................................... 136
    A.  Law ....................................................... 136
        1.  Hostile Work Environment .............................. 137
            a.  Hostile or Abusive Conduct ....................... 137
            b.  Work Environment ................................. 138
        2.  Employer Imputed Liability ............................ 139
            a.  Reasonable Avenue of Complaint.................... 140
            b.  Notice and Response .............................. 140
    B.  Application of Law to Facts ............................... 141
        1.  Sexual Assault in Rome ................................ 141
        2.  Flight from Rome ...................................... 142
        3.  Fear of Additional Encounters ........................ 142

IV  TORTS .......................................................... 143
    A.  Intentional ............................................... 143
    B.  Negligent ................................................. 143

V   CONCLUSION ..................................................... 144

## I INTRODUCTION

P. (Plaintiff) sues Delta Airlines, Inc., which employs her as a cabin flight attendant, and M. (Defendant), who was formerly so employed, for rapes Defendant allegedly committed on her while the two were off-duty following a Delta flight to Rome, Italy. She contends that he administered a "date rape" drug and then committed the sexual assaults.

After a mistrial in which a ten member jury split nine to one in favor of defendants on the underlying question of whether a rape had in fact occurred, Delta moves for summary judgment. *See* Fed. R.Civ.P. 56. The motion is granted. To hold an employer liable in these circumstances would be to encourage unacceptable inquisitorial snooping and intrusiveness by employers into the private lives of their employees, contrary to fundamental American notions of privacy.

Both Defendant and Plaintiff are mature; one is approaching forty, the other is almost fifty, and both were previously married. Delta can not be faulted for failure to warn this plaintiff that years before, in private residences far removed in time and place from any Delta related work activities, Defendant may have engaged in non-consensual intercourse with fellow employees, or that he had sexual relations with a number of female employees between Delta trips to and from Rome (a matter it could not have known about before plaintiff's complaint).

Arguably, if Defendant were a sexual predator who should have been known by his employer to be a danger to females, Delta would have had an obligation to warn her or to decrease the hazards of his sexual rapacity by not providing the pair with adjacent hotel rooms. Arguably, were Plaintiff an immature person requiring special protection and advice, Delta would have had an obligation to not expose her to this danger or to provide an appropriate chaperon. Arguably, were it mooted about by employees that Defendant was a sexual hazard to be avoided and guarded against, Delta would have had an obligation to prevent the degeneration of work related surroundings by his presence. The evidence supports none of these hypotheses.

## II FACTS

Analyzing the evidence to favor Plaintiff's version, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), this story may be briefly summarized from her point of view.

She was a long time Delta cabin flight attendant assigned to her first flight from J.F.K. International Airport to Rome. He was a cabin flight attendant regularly assigned to Delta's New York–Rome flights. They had neither met nor heard of one another prior to the March 16, 1998 trip to Rome. Neither had supervisory authority over the other.

Upon arriving in Rome on the morning of March 17, Plaintiff and Defendant, together with the rest of the flight crew, were driven in a Delta bus to a hotel where the airline had arranged for the crew to stay until the return flight to New York on March 18. Responding to his offer of some wine, Plaintiff went to his hotel room at about 11 a.m. There he served her wine spiked with a "date rape" drug.

Within a short period Plaintiff fell comatose on his bed, awakening only intermittently, but realizing during these periods of partial consciousness that Defendant was raping her. She was unable to defend herself. After five hours, Plaintiff came-to. She returned to her hotel room where she slept until awakened at 7 p.m. by a telephone call to join crew members for dinner. While dressing for dinner, she found no seminal fluid on her clothes or body, but threw away her undergarments.

During dinner Plaintiff did not discuss the sexual assault. He was not present.

Plaintiff and Defendant both worked aboard the March 18th return flight to New York. Neither then nor upon landing in New York did she report the incident.

Two weeks later, on March 30, 1998, Plaintiff complained about the rape to a fellow flight attendant who had worked as lead attendant on the March 16 and 18 trips to and from Rome, but she asked that the information not be relayed to Delta management; it was not. More than three weeks after the assault, on April 11, 1998, Plaintiff informed a Delta flight attendant supervisor of the assault, but declined to give her attacker's name. A month after the assault she informed a Delta J.F.K. base supervisor that she had been raped, but again declined to identify the attacker; in contravention of Delta's printed policy statement requiring immediate reports of sexual harassment, Plaintiff refused a specific request to provide a written statement detailing the event.

Finally, some month and a half after the rape Plaintiff told Delta her attacker's name. Defendant was immediately interviewed by Delta officials. He denied that the incident had taken place and submitted a written statement detailing his actions on March 17.

More than two months after the attack, on June 25, 1998, Plaintiff gave Delta a first written report. Upon receiving it, Delta suspended Defendant without pay. He resigned or was fired a few months later without ever having been permitted to return to work.

Though no evidence appears in Delta's records, it is alleged (and assumed to be true) that the airline knew that some years before: (1) another female flight attendant visited Defendant for the night at his home in Texas where he seduced her; and, (2) yet another female flight attendant slept with him in his family's home in Florence, Italy, where sexual congress ensued without her full consent.

During the trial two other sexual encounters Defendant had engaged in with female flight attendants were revealed—one a fully consensual liaison and the other a repeated voluntary sexual partnership that may have begun by his spiking wine with a "date rape" drug. It is not contended that Delta had any knowledge of either of these affairs prior to the sexual assault on Plaintiff.

## III  STATUTORY SEXUAL HARASS-MENT

Plaintiff asserts claims for unlawful workplace sexual harassment under federal law as well as under New York State and City laws. See, e.g., 42 U.S.C. §§ 2000e, et seq.; N.Y. Exec. L. §§ 296.1, 296.6, & 296.7; N.Y.C. Admin. Code § 8-107. For purposes of this motion, New York State and City discrimination laws are assumed to mirror federal law. See, e.g., Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n. 1 (2d Cir.2000). ("consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims"); Smith v. Xerox Corp., 196 F.3d 358, 363 n. 1 (2d Cir.1999) ("claims under the [New York State Human Rights Law] are analyzed identically to claims under . . . Title VII").

### A.  Law

Title VII of the Civil Rights Act of 1964 provides in pertinent part:

> [i]t shall be an unlawful employment practice of an employer . . . to . . . discriminate against any individual with respect to . . . conditions, or privileges of employment, because of such individuals . . . sex[.]

42 U.S.C. § 2000e–2(a)(1). "[S]exual harassment in the workplace violates Title VII's broad rule of workplace equality." Karibian v. Columbia University, 14 F.3d 773, 777 (2d Cir.1994) (internal quotation marks omitted); see Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Claims

of workplace sexual harassment can be advanced under two theories: (1) quid pro quo, and (2) hostile environment. *See, e.g., Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997); *Carrero v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989).

Quid pro quo harassment occurs "when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'" *Karibian,* 14 F.3d at 777 (quoting 29 C.F.R. § 1604.11(a)(2)) (changes in original); *see also id.* (prima facie case consists of "evidence that [the plaintiff] was (1) subject to unwelcome sexual conduct, and (2) that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of employment" (internal quotation marks omitted)). No such harassment is alleged here.

A hostile work environment exists when gender-based "intimidation, ridicule, and insult ... is *sufficiently severe* or *pervasive* to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); (emphases added). To state an actionable claim, a plaintiff must establish that (1) "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[,]'" and (2) "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997); *see Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992).

### 1. Hostile Work Environment

In order to establish the first element—an abusive work environment—a plaintiff must identify hostile or abusive conduct and establish a connection between that conduct and the work environment.

### a. Hostile or Abusive Conduct

Whether unwelcome conduct by a fellow employee "is 'hostile' or 'abusive' depends on the totality of circumstances." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767–68 (2d Cir.1998). A plaintiff must establish both an "objectively hostile work environment, as well as a subjective perception by the plaintiff that the environment was abusive[.]" *Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir.1995); *see Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Factors considered include: "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."' *Quinn,* 159 F.3d at 767–68 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

Though this inquiry is not subject to "a mathematically precise test," *Harris,* 510 U.S. at 22, 114 S.Ct. 367, the court of appeals for the Second Circuit has provided benchmarks:

> As a general matter, isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive. However, where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition: [E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability.

*Quinn,* 159 F.3d at 768 (internal citations and quotation marks omitted) (change in original). As the Supreme Court has advised, "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca*

*Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ The sexually charged acts constituting a hostile work environment need not be directed at the plaintiff—either in whole or in part—to create a viable claim. *See, e.g., Perry,* 115 F.3d at 151 ("Evidence of the harassment of women other than [plaintiff], if part of a pervasive or continuing pattern of conduct, [is] surely relevant to show the existence of a hostile environment."); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416–17 (10th Cir.1987) (quoting approvingly: "Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere where such harassment was pervasive."); *see also Hirase–Doi,* 61 F.3d at 782 n. 2; *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 863 (3d Cir.1990); *Leibovitz v. New York City Trans. Auth.,* 4 F.Supp.2d 144, 150–53 (E.D.N.Y.1998).

■ In pointing to sexual acts directed at others to make out a hostile work environment claim, the plaintiff "may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment." *Hirase–Doi,* 61 F.3d at 782. This limitation results from the requirement that the plaintiff must have had a subjective perception that the environment was abusive. A plaintiff who did not know of the sexual acts directed at co-workers during the time in which she claims to have experienced a hostile work environment cannot assert them as a basis for believing her general work environment was so abusive as to effectively alter her working conditions. *See id.*

b. Work Environment

■ For purposes of stating a hostile work environment claim, the "work environment" in which the abusive and hostile acts can occur reaches beyond the traditional "work place." Nonetheless, when the sexual acts occur outside the work place, the plaintiff must identify sufficient facts from which to infer a connection between the abusive and hostile sexual conduct and the employment. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1306 (2d Cir.1995); *Huitt v. Market Street Hotel Corp.,* No. 91–1488–MLB, 1993 WL 245744, at *5 (D.Kan. June 10, 1993).

■ Because Title VII is aimed at immunizing employees' work environment from sexual intimidation and repression, employers can avoid liability for unwelcome or hostile sexual acts resulting from off-duty interactions between co-workers. *See, e.g., Alvey v. Rayovac Corp.,* 922 F.Supp. 1315, 1330 (W.D.Wis.1996). As a general proposition, employers are not responsible under Title VII for hostile sexual acts resulting from non-work-related, off-duty interactions between co-employees.

Determining whether unwelcome sexual conduct outside the work place is sufficiently work related to fall within Title VII's reach may be difficult because work relations often blossom into intense personal relationships.

> As the work force grows and people spend more of their time at work, the workplace inevitably becomes fertile ground for the dating and mating game. It is certainly not unusual, and it may even be desirable, for love to bloom in the workplace. Contiguity can lead to sexual interest, which can lead to soft music, candlelight dinners, serious romance, and marriage, or any stops along the way.

*Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1353 (7th Cir.1995) ("[We] should not be in the business of throwing a wet blanket over activities that can lead to consensual amour."); *see also Ganzy v. Allen Christian Sch.,* 995 F.Supp. 340, 350–59 (E.D.N.Y.1998).

■ A more difficult—though related—question is: can an actionable Title VII claim for hostile work environment be brought against the employer because the

victim of an off-duty non-work-related sexual assault is subsequently forced to work alongside the attacker? The answer is yes. When a violent sexual assault on a co-worker occurs outside of the work environment during the employees' off-duty personal hours, continuing resentment and fear on the job can affect employment "terms, conditions, or privileges[.]" 42 U.S.C. § 2000e–2(a)(1).

Depending on the nature of the off-duty conduct alleged, the employer may face liability for continuing to employ the victim and the attacker in close proximity where the presence of the attacker can reasonably be expected "to alter the conditions of the victim's employment[,]" and the victim in fact experiences such a change. *Harris*, 510 U.S. at 21, 114 S.Ct. 367; *see Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[A] sexually objectionable· environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so.").

A contrary conclusion—that an employer is never obligated to mitigate the *work related consequences* of an off-duty, violent sexual assault by one co-worker on another—would have the effect of penalizing the victim by "detract[ing] from job performance" and "discourag[ing][her] from remaining on the job" because of predictable psychological pressures. *Harris*, 510 U.S. at 22, 114 S.Ct. 367.

■ To avoid liability for the work-related consequences from off-duty sexual attacks, therefore, an employer must provide a reasonable avenue for complaint. Additionally, once put on notice of the off-duty sexual assault and its consequences to the victim's work environment, the employer must take prompt corrective action. *See infra* Part IV.A.2.

2. Employer Imputed Liability

The second element required for a hostile work environment claim is "a specific basis ... for imputing the conduct that created the hostile environment to the employer." *Perry*, 115 F.3d at 149; *Tomka*, 66 F.3d at 1305; *Karibian*, 14 F.3d at 780 ("[A] plaintiff seeking to establish harassment under a hostile environment theory must demonstrate some specific basis to hold the employer liable for the misconduct of employees."). Relevant to this inquiry is the status of the employee-harasser; the degree to which employers are held liable for sexual harassment of employees varies depending on whether "the alleged harasser is the plaintiff's supervisor [or] ... her co-worker." *Karibian*, 14 F.3d at 779.

■ When a supervisor creates an actionable hostile work environment, the employer is automatically subject to vicarious liability. *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 763, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. A "supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided" in carrying out the harassment by his employment position. *Burlington Indus.*, 524 U.S. at 765, 118 S.Ct. 2257.

> When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose "power to supervise—[which may be] to hire and fire, and to set work schedules and pay rates—does not disappear ... when he chooses to harass through insults and offensive gestures rather than directly with threats or promises of promotion."

*Faragher*, 524 U.S. at 803, 118 S.Ct. 2275. Employers also have "a greater opportunity to guard against misconduct by supervisors"; they can "screen them, train them, and monitor their performance." *Id.* at 803, 118 S.Ct. 2275; *see also McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 358, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995)

("Congress designed the remedial measures in [Title VII] to serve as a 'spur or catalyst' to cause employers 'to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' of discrimination. Deterrence is one object of these statutes." (internal citations omitted)).

■ In contrast, where an employee of equal or inferior rank and authority is responsible for the harassment, the employer generally will not be liable unless the employer either (1) provided no reasonable avenue for complaint, or (2) knew of the harassment but did nothing about it. *See, e.g., Perry,* 115 F.3d at 149; *Tomka,* 66 F.3d at 1305; *Karibian,* 14 F.3d at 780; *see also Quinn,* 159 F.3d at 767 ("In contrast to allegations of harassment by co-workers . . ., employers are presumptively liable for all acts of harassment perpetrated by an employee's supervisor." (citing *Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. 2257)); *cf.* 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer . . . knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.").

### a. Reasonable Avenue of Complaint

■ Whether an employer has provided a reasonable avenue for complaint varies with the structural organization of the company and the resources available to it. Factors to consider include whether: 1) the employer has an anti-harassment policy in place; 2) that policy makes it clear that harassment is strictly prohibited; 3) the policy is seriously enforced; 4) employees are informed how to report sexual harassment; 5) the policy is effectively communicated to employees; and 6) other programs or actions are taken by the employer to eliminate sexual harassment. *See, e.g., Fiscus v. Triumph Group Operations, Inc.,* 24 F.Supp.2d 1229, 1240–41

(D.Kan.1998); *Duran v. Flagstar Corp.,* 17 F.Supp.2d 1195, 1202 (D.Colo.1998).

### b. Notice and Response

■ As a general matter, an employer must have actual notice of the hostile work environment before it is required to take remedial action. Nevertheless, the employer is assumed to know what a reasonably astute and concerned employer would have known under the circumstances. *See, e.g., Torres v. Pisano,* 116 F.3d 625, 634 n. 9 (2d Cir.1997) ("An official's actual or constructive knowledge of harassment will be imputed to the employer when principles of agency law so dictate."). Employers will be deemed to have constructive notice of harassment "if officials sufficiently high in the management hierarchy should have gained knowledge of it through the exercise of reasonable care." *Torres,* 116 F.3d at 634 n. 9. If a co-worker has knowledge of a harassee's complaint and that co-worker is "charged with substantial responsibility for relaying employee complaints to management, particularly where management is located away from the workplace[,]" the employer may also be deemed to have constructive knowledge of the harassment. *Id.* at 637.

When an employer is aware of evidence of sexual harassment against other employees "that is similar in nature and near in time" to the plaintiff's allegations this too may be sufficient to establish notice. *Hirase–Doi v. U.S. West,* 61 F.3d 777, 784 (10th Cir.1995). Liability may be imputed to the employer because it "reasonably should have anticipated that the plaintiff would become a victim of sexual harassment in the workplace and yet failed to take action reasonably calculated to prevent such harassment." *Paroline v. Unisys Corp.,* 879 F.2d 100, 107 (4th Cir.1989), *vacated in part on other grounds,* 900 F.2d 27 (1990) (en banc); *see also Perry,* 115 F.3d at 151 ("Evidence of the harassment of women other than [plaintiff], if part of a pervasive or continuing pattern of conduct, . . . could have been found probative of the

company's notice of that environment . . . .").

■ Once an employer has knowledge of a co-worker's harassing conduct, "the law imposes . . . a 'duty to take reasonable steps to eliminate it.'" *Torres*, 116 F.3d at 636. Though the reasonableness of the employer's response will necessarily vary based on the underlying allegations of harassment, at a minimum an employer should promptly investigate the allegations and take effective steps to ensure that the conduct does not recur. *Cf. Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2d Cir.1992) ("[N]ot every response to a complaint [of sexual harassment] should take the form of a discharge[.]").

### B. Application of Law to Facts

Plaintiff alleges two encounters with her attacker which serve as the basis for her hostile work environment claims against Delta. The first was the alleged assault in Defendant's Rome hotel room. The second was working with him on the return Delta flight from Rome to New York. Plaintiff alleges no other contact between the two.

### 1. Sexual Assault in Rome

With respect to Delta's liability for the sexual assault in Rome, the threshold issue is whether Plaintiff's presence in the hotel room was sufficiently related to her employment that the room was effectively a "work environment" falling within Title VII. Inquiries of this nature are inherently fact based, but off-site encounters between employees may be sufficiently related to the employment to constitute a "work environment." *See, e.g, Tomka*, 66 F.3d at 1306.

For example, in *Tomka*, two of the plaintiff's supervisors and one co-worker were alleged to have raped her. The rape occurred immediately after a business dinner attended by the four during which a substantial quantity of alcohol was consumed. *Id.* at 1301–02, 1306. There was a sufficient connection between plaintiff's employment and the assault to raise a material question as to whether it occurred in a "work environment"; the plaintiff's supervisors may have "used their actual or apparent authority to accomplish the rape." *Id.* at 1306. Relevant though not explicitly addressed was the fact that dinners such as the one which preceded the rape were encouraged by the employer. *See id.* at 1301 ("company policy for . . . employees . . . to transact business during these meals").

It is possible that a sexual assault during a flight layover could be found to occur in a "work environment," implicating Title VII liability of the employer. The employees are away from home and together because of their employment.

■ In the instant case the environment was not work-related. Plaintiff was not only off-duty, she voluntarily associated with defendant—someone who had no supervisory authority over her—for purely personal reasons. No evidence has been presented linking her decision to go to Defendant's room with her employment by Delta.

Had Defendant been a supervisor or had he had supervisory authority, an inference that Plaintiff felt coerced into going to his room might present a fact question of whether the attack occurred in a "work environment." Alternatively, had Plaintiff introduced evidence that Delta had a policy or practice of encouraging flight attendants to commingle in one another's rooms a fact question might exist as to whether the attack took place in a "work environment." No such evidence has been presented.

Also lacking is evidence that Delta was, or could have been, aware that the attacker was a sexually dangerous predator who should not have been placed in close proximity to a fellow employee. *See infra* Part III.B.2.

## 2. Flight from Rome

During the time Plaintiff was forced to work in close proximity with her attacker on the March 18 flight back to New York, Delta was potentially liable for the *work-related consequences* of the assault. Given the violent and traumatic nature of rapes, it cannot be said as a matter of law that Plaintiff did not experience both an objectively and subjectively "sexually objectionable" work environment during this period, satisfying for purposes of this motion the first element of a hostile work environment claim. *See Faragher,* 524 U.S. at 787, 118 S.Ct. 2275; *see also Meritor,* 477 U.S. at 65, 106 S.Ct. 2399.

Plaintiff must also establish a basis for imputing liability to Delta for her unease during the flight back—the second element of a hostile work environment claim. *See Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992). As earlier noted, where a non-supervising co-worker "is the alleged harasser, an employer will generally not be liable unless the employer either [1] provided no reasonable avenue for complaint or [2] knew of the harassment but did nothing about it." *Tomka,* 66 F.3d at 1305.

With respect to the first prong, Delta provided a reasonable avenue for complaint. It had a comprehensive anti-discrimination policy that covered sexual harassment. Delta informed its employees and supervisors about the policy through training sessions, manuals, posters, memoranda, brochures, and mailings. It took reasonable steps to ensure that employees were aware of the host of reporting options, including availability of the employee's supervisor, any manager in the employee's department, and Delta's Equal Opportunity Office. Both Plaintiff and Defendant were aware of the airline's policy and its available reporting procedures at all relevant times.

As to the second prong—that the employer knew of the harassment but did not reasonably take action to prevent it—there is no dispute that at the time of the return flight from Rome Delta was not aware, and could not have known, that a sexual assault had occurred.

Plaintiff contends that because Delta might have been aware of two earlier reports of her attacker's off-duty, non-work related improper sexual conduct, it had constructive notice. *Cf. Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 784 (10th Cir.1995). Although knowledge that a co-worker has allegedly assaulted other persons may in some instances be sufficient to put an employer on constructive notice that a sexual assault is likely to occur, the facts of this case present no material question of constructive notice. Earlier complaints of sexual improprieties involved non-work related, off-duty encounters, substantially curtailing both the practical ability and the legal authority of Delta to investigate. *Cf. Ambrosio v. Price,* 495 F.Supp. 381, 386 (D.Neb.1979) ("An employer cannot be expected to exercise control over the personal, as opposed to business, activities of its employees in order to protect third persons.").

■ Having provided reasonable avenues for complaint and having had no notice of the off-duty, non-work related sexual assault, Delta cannot be held liable for any anxiety plaintiff experienced during the flight from Rome.

## 3. Fear of Additional Encounters

■ Although Plaintiff concedes that she never worked with or even encountered her attacker after the return flight from Rome, she contends that the continuing possibility and uncertainty of being forced to work with Defendant again (until his suspension) had the effect of sustaining an on-going hostile work environment for which Delta is responsible. Such trepidation, standing alone, is too hypothetical and speculative to support a contention that there was an "objectively hostile or abusive work environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114

S.Ct. 367, 126 L.Ed.2d 295 (1993). This conclusion is supported by the fact that Plaintiff's continuing fear of again encountering her attacker at work was caused by her own delay in identifying him to Delta.

## IV   TORTS

With respect to state causes of action, the Plaintiff and Delta have consistently asserted that New York law applies; they are deemed to have consented to its application. *See Celle v. Filipino Reporter Enterprises, Inc.,* 209 F.3d 163, 175 (2d Cir. 2000) (implied choice of law).

Plaintiff has asserted claims of assault, battery, false imprisonment and intentional infliction of emotional distress against Delta under the doctrine of respondeat superior. She has also advanced claims for negligent hiring, retention, and supervision.

### A.   Intentional

■ Under the doctrine of respondeat superior, an employer may be held vicariously liable for a tort "committed by an employee while acting within the scope of his employment." *Tomka,* 66 F.3d at 1317 (citing *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979); *Heindel v. Bowery Savings Bank,* 138 A.D.2d 787, 525 N.Y.S.2d 428 (3d Dep't 1988)). "However, an employer is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business." *Tomka,* 66 F.3d at 1317 (citing *Heindel,* 525 N.Y.S.2d at 428; *Island Assoc. Coop., Inc. v. Hartmann,* 118 A.D.2d 830, 500 N.Y.S.2d 315, 316 (2d Dep't 1986)); *see Judith v. Sisters of Charity Hospital,* 93 N.Y.2d 932, 933, 693 N.Y.S.2d 67, 715 N.E.2d 95 (1999) ("Assuming plaintiff's allegations of sexual abuse are true, it is clear that the employee here departed from his duties for solely personal motives unrelated to the furtherance of the Hospital's business."). An employer is not liable for the unpredictable intentional acts of an employee committed for purely personal reasons.

■ There is no basis to conclude that the claimed sexual assault was anything other than a purely personal act. As in *Tomka,* this defect is fatal. *See Tomka,* 66 F.3d at 1317; *see also, e.g., Moore v. Sam's Club,* 55 F.Supp.2d 177, 195 (S.D.N.Y.1999) ("[T]he intentional torts of employees related to sexual misconduct 'arise from personal motives and do not further an employer's business, even when committed within the employment context.'"). Plaintiff cannot, as a matter of law, sustain actions against Delta for assault, battery, false imprisonment, or emotional distress stemming from the assault.

### B.   Negligent

As to Plaintiff's negligence claims, it is assumed—without deciding—that the New York Workers Compensation Act does not operate to bar employee suits against employers for tortious acts by a fellow employee in a foreign setting arranged by the employer for its benefit. *See* N.Y. Work. Comp. Law § 29(6) (preempting actions against an employer for injuries sustained by an employee in the course of employment).

New York recognizes claims of negligent hiring, retention and supervision against employers for employee's whose conduct causes harm. *See Kenneth R. v. Roman Catholic Diocese,* 229 A.D.2d 159, 654 N.Y.S.2d 791, 795 (2d Dep't 1997) ("In instances where an employee cannot be held vicariously liable for its employee's torts, the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision.").

■ With respect to the negligent hiring claim, Plaintiff has produced no evidence that Delta knew or should have known of any hostile sexual acts committed—either in the workplace or elsewhere—by Delta when it hired him. *See Kenneth R.,* 654 N.Y.S.2d at 795. This absence of evidence is fatal to plaintiff's claim for negligent hiring.

**144**

The negligent supervision and negligent retention claims also have no merit. An employer does not owe a duty, and is not liable, to persons who are injured by its employees while the employees are off duty, not then acting for the employer's benefit, not on the employer's premises, and not using the employer's equipment. *See, e.g., D'Amico v. Christie,* 71 N.Y.2d 76, 78, 524 N.Y.S.2d 1, 518 N.E.2d 896 (1987) (Kaye, J.) (employer's liability for torts committed by its employees outside the course and scope of their employment "is limited to torts committed by employees on the employer's premises or with the employer's chattels"); *Ross v. Mitsui Fudosan, Inc.,* 2 F.Supp.2d 522, 533 (S.D.N.Y.1998) (same); *see also Anderson v. Adam's Mark Hotels and Resorts,* No. 99–1100, 2000 WL 390107, at *2 (10th Cir.2000); *Feingold v. Delta Air Lines, Inc.,* 3:99–cv–0728–T, (N.D.Tex. Oct. 20, 1999) (Maloney, J.) (slip-op); *Ambrosio v. Price,* 495 F.Supp. 381, 386 (D.Neb.1979) ("An employer owes no duty to persons who are injured by its employees while the employees are off duty and not on the employer's premises.").

There is no dispute that Plaintiff and Defendant were off duty and not acting on Delta's behalf at the time of the assault. *Cf. Rich v. Delta Air Lines, Inc.,* 921 F.Supp. 767, 776–77 (N.D.Ga.1996). Although Plaintiff and Defendant were staying in hotel rooms paid for by Delta, the airline neither had control over activities in those rooms, nor did it have access to the rooms. The hotel accommodations cannot be considered the airline's "premises" or "equipment" as support for a claim of negligence against Delta for the assault.

## V CONCLUSION

Delta's motion for summary judgment is granted. Costs and disbursements are assessed against Plaintiff.

There being no just reason for delay, entry of a final judgment in favor of Delta is directed. *See* Fed.R.Civ.P. 54(b).

The action against the individual defendant—the alleged attacker—will proceed.

SO ORDERED